RETURN TO CLIENT

FILED

Conal Doyle, Cal. Bar #: 227554
WILLOUGHBY DOYLE LLP
1814 Franklin Street, Suite 800
Oakland, CA 94612
(510) 451-2777
fax: (510) 835-1050
conal@willoughbydoyle.com

2008 OCT -7  PM 2: 50

CLERK U.S. DISTRICT COURT
CENTRAL DIST OF CALIF
LOS ANGELES

BY: _____

Adele Kimmel, Cal. Bar #: 126843
PUBLIC JUSTICE, P.C.
1825 K Street, NW, Suite 200
Washington, DC 20006
(202) 797-8600
fax: (202) 232-7203
akimmel@publicjustice.net

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARTIN HERNANDEZ BANDERAS, | Case No.: CV08-06594 PSG(CTx) |
| Plaintiff, | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| vs. | |
| THE UNITED STATES OF AMERICA; GENE MIGLIACCIO, in his individual capacity; TIMOTHY SHACK, M.D., in his individual capacity; ESTHER HUI, M.D., in her individual capacity; and DOES 1-10, | **First Cause of Action** - FTCA Claim against UNITED STATES for Medical Negligence (Non-Jury Claim) |
| Defendants. | **Second Cause of Action** - FTCA Claim against UNITED STATES for Negligent Establishment of Policy for Providing Medical Care to Immigration Detainees (Non-Jury Claim) |
| | **Third Cause of Action** - FTCA Claim against UNITED STATES for Negligent Application of Policy for Providing Medical Care to Immigration Detainees (Non-Jury Claim) |
| | **Fourth Cause of Action** - FTCA Claim against UNITED STATES for Negligent Hiring/Retention (Non-Jury Claim) |
| | **Fifth Cause of Action** - FTCA Claim |

|   |   |
|---|---|
| 1 | ) against UNITED STATES for Negligent ) Supervision (Non-Jury Claim) |
| 2 | ) |
| 3 | ) **Sixth Cause of Action** - FTCA Claim ) against UNITED STATES for Negligent |
| 4 | ) Training (Non-Jury Claim) ) |
| 5 | ) **Seventh Cause of Action** - FTCA Claim ) against UNITED STATES for Intentional |
| 6 | ) Infliction of Emotional Distress (Non-Jury ) Claim) |
| 7 | ) |
| 8 | ) **Eighth Cause of Action** -Bivens Claim ) for Inadequate Medical Care against all |
| 9 | ) Individually Named Defendants  and ) DOES 1-10 |
| 10 | ) |
| 11 | ) **Ninth Cause of Action** -Bivens Claim for ) Equal Protection Violation against all |
| 12 | ) Individually Named Defendants  and ) DOES 1-10 |
| 13 | ) |

Plaintiff, MARTIN HERNANDEZ BANDERAS, by and through his undersigned counsel, hereby files this Complaint and Demand for Jury Trial and states as follows:

## PRELIMINARY STATEMENT

1.      MARTIN HERNANDEZ BANDERAS ("HERNANDEZ BANDERAS"), a former immigration detainee, received such grossly inadequate medical care for a diabetic foot wound while in federal custody that he developed a gangrenous skin and bone infection that has resulted in permanent physical deformity and impairment, including a recommendation to amputate his leg due to severe tissue death.  This lawsuit charges the federal government, and/or their agents, with constitutional violations, and medical negligence and other torts, based on their egregious medical neglect of HERNANDEZ BANDERAS.

2.      The Defendants' refusal to provide HERNANDEZ BANDERAS reasonable and humane medical care while he was in custody was tantamount to torture.  He was denied adequate medical care, including a referral to a diabetic wound specialist, that would have prevented tremendous pain and suffering, physical disfigurement, and the future loss of his leg.  His medical condition was so serious, and the stench of dying and decaying flesh on his leg became so overbearing, that his fellow detainees staged a hunger strike in an effort to coerce DIHS to provide HERNANDEZ BANDERAS appropriate care.

## JURISDICTION AND VENUE

3.      Jurisdiction of the court is proper under 28 U.S.C. §§ 1331, 1343(3), and 1346.

4.      Venue is proper in this district pursuant to 28 USC §§ 139 (b)(2) and 1391(e), in that the plaintiff is a resident of the judicial district.

5.      This is an action for medical negligence and other torts, pursuant to 28 U.S.C. §§1346 and 2672 (the Federal Tort Claims Act), as well as violations of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, pursuant to *Bivens*, for failing to provide Plaintiff with adequate medical care and with equal protection under the law.

6.      Compensatory damages are sought pursuant to the Federal Tort Claims Act and *Bivens*.  Punitive damages are sought against all Defendants sued in their individual capacity pursuant to *Bivens*.

7.    All governmental entities were notified of this claim in a timely fashion and all administrative exhaustion and notice requirements under the FTCA have been satisfied.

**PARTIES**

8.    MARTIN HERNANDEZ BANDERAS is an adult male natural person, and is a resident of the State of California, residing in the area of jurisdiction encompassed by the United States District Court, Central District of California.  At all relevant times, he was detained and in the custody of either the United States as a "civil or pre-trial detainee."

9.    THE UNITED STATES OF AMERICA ("UNITED STATES") is a governmental entity with jurisdiction and control over Immigration and Customs Enforcement ("ICE") and the Department of Immigration Health Services ("DIHS").  Plaintiff was detained in an ICE facility during the relevant time period:  San Diego Correctional Facility ("SDCF") in San Diego.

10.    GENE MIGLIACCIO ("MIGLIACCIO"), at all relevant times, was Director of DIHS.  DIHS, a component of the U.S. Department of Health and Human Services (HHS), provides and oversees health care services to immigration detainees pursuant to an Interagency Agreement between ICE and HHS.  DIHS provides primary on-site health care to detainees at SDCF.  MIGLACCIO was one of the principal creators of the Immigration Detainee Health Care policy.  Based on information and belief, at all material times, he was aware that HERNANDEZ BANDERAS had a life-threatening medical condition that required urgent medical attention, diagnosis, and treatment, and he purposefully denied him basic and humane medical care for illegal and improper

reasons unrelated to medical decision making and related functions. He is being sued in his individual capacity.

11.    TIMOTHY SHACK, M.D. ("SHACK"), at all relevant times, was Associate Director for Medical Services at DIHS. As such, SHACK was responsible for the administration and provision of health care services to individuals in ICE custody, and for developing and ensuring compliance with policies, procedures and clinical guidelines related to detainee health care. SHACK was one of the principal creators of the Immigration Detainee Health Care policy that governed the care HERNANDEZ BANDERAS received while in detention. Based on information and belief, at all material times, he was aware that HERNANDEZ BANDERAS had a life-threatening medical condition that required urgent medical attention, diagnosis, and treatment, and he purposefully denied him basic and humane medical care for illegal and improper reasons unrelated to medical decision making and related functions. He is being sued in his individual capacity.

12.    ESTHER HUI, M.D. ("HUI"), at all relevant times, was a Medical Doctor at SDCF, and was the physician responsible for HERNANDEZ BANDERAS's care and treatment while he was incarcerated at that facility. At all material times, she was aware that HERNANDEZ BANDERAS had a life-threatening medical condition that required urgent medical attention, diagnosis, and treatment, and she purposefully denied him basic and humane medical care for illegal and improper reasons unrelated to medical decision making and related functions. She is being sued in her individual capacity.

13.    Defendants Does 1-10 are herein sued under fictitious names. Their true names and capacities are unknown to Plaintiff. Defendants Does 1-5 are business

entities of unknown form who were the employers of the individually named Defendants and/or Does 5-10.  Based on information and belief, Plaintiff alleges that Does 5-10 were the employees, officers, directors, managing agents, and/or supervisors of the UNITED STATES and that Does 1-10 were acting within the scope and course of their employment and authority at all times relevant to this Complaint.

## FACTUAL ALLEGATIONS

14.     HERNANDEZ BANDERAS entered ICE custody at SDCF on or about October 26, 2006.  The medical intake screening noted no known physical abnormalities or injuries to his lower extremities.

15.     During the first week of December, 2006, HERNANDEZ BANDERAS sustained a small cut to his ankle while showering.

16.     On December 12, 2006, he was brought to the SDCF medical center in a wheelchair, complaining that he had been experiencing severe pain in his right ankle for the past week.  A DIHS nurse documented that his ankle was red, hot, swollen, and tender.

17.     On December 12, a physician assistant, Anthony Walker ("WALKER"), documented that pus was oozing from HERNANDEZ BANDERAS's foot and ankle, his ankle was painful, and his foot was numb.

18.     HERNANDEZ BANDERAS was then seen by HUI, who documented that HERNANDEZ BANDERAS started with an ulcer on his right big toe which then spread to his ankle and burst.  HUI documented eschar (dead skin tissue) on HERNANDEZ BANDERAS's toe and ankle and prescribed debridement (removal of dead tissue).  The area was incised with a scalpel, pus was expressed, and the wound was bandaged.

19.     WALKER diagnosed HERNANDEZ BANDERAS with cellulitis (infection to the deepest layer of the skin), diabetes mellitus, and mild gangrene to the big toe.

20.     On December 12, HERNANDEZ BANDERAS's blood sugar level was 298 mg/dl, an extremely high and abnormal reading.  DIHS administered insulin purportedly to control HERNANDEZ BANDERAS's blood sugar level.

21.     On December 13, DIHS documented that HERNANDEZ BANDERAS had swelling, pain and tenderness on his right foot and an abnormally high blood sugar level.  On the same day, HUI documented that HERNANDEZ BANDERAS had poor pulses in his right foot, drainage of the wound overnight, and pain.  She removed more dead tissue from his leg.  He had a 103 degree fever.

22.     HUI failed to refer HERNANDEZ BANDERAS to a diabetic wound specialist, despite that fact that she was well aware that foot ulcers in diabetic patients require multidisciplinary assessment, usually by diabetes specialists and surgeons.  Moreover, HUI knew that properly controlling insulin levels is essential to promoting proper healing in a diabetic foot wound and that death and amputation are well recognized potential consequences of failing to adequately treat a diabetic foot wound.

23.     On December 14, a nurse documented that HERNANDEZ BANDERAS had large areas of purple degraded skin on his ankle and foot.  HERNANDEZ BANDERAS was placed on IV antibiotics.

24.     On December 15, HUI documented that HERNANDEZ BANDERAS continued to have bloody drainage from his wound.  A nurse documented that his leg was red, swollen, painful, and that he ambulated with crutches as he could only bear weight minimally.

25. On December 17, DIHS documented that HERNANDEZ BANDERAS had pain of 7/10 and was walking with crutches.

26. On December 18, HUI falsely documented that HERNANDEZ BANDERAS stated "that he was fine" and that he was able to walk without difficulty.

27. On the same day, a nurse documented that HERNANDEZ BANDERAS had "limited mobility" and purple discoloration to his foot and ankle.

28. On December 20, HERNANDEZ BANDERAS blood sugar level was checked again, registering 213 mg/dl, an extremely high and abnormal reading. HERNANDEZ BANDERAS was purportedly provided insulin.

29. On December 21, HERNANDEZ BANDERAS's "fasting" blood sugar level was checked again at 5:55 a.m., registering 147 mg/dl, an extremely high and abnormal reading.   HERNANDEZ BANDERAS was purportedly provided insulin.

30. Another record from December 21 documented that HERNANDEZ BANDERAS's blood sugar level was 243 mg/dl, an extremely high and abnormal level, at 4:49 p.m.  Insulin was ordered again.

31. On December 22, HERNANDEZ BANDERAS's blood sugar level was checked again, registering 201 mg/dl, an extremely high and abnormal reading. HERNANDEZ BANDERAS was purportedly provided insulin.  He also complained of pain throughout the day and that the pain medication provided was not helping.

32. On December 23, HERNANDEZ BANDERAS's blood sugar level was checked again, registering 205 mg/dl, an extremely high and abnormal reading. HERNANDEZ BANDERAS was purportedly provided insulin.

33. On December 24, HERNANDEZ BANDERAS's "fasting" blood sugar level

was checked again at 6:21 a.m., registering 165 mg/dl, an extremely high and abnormal reading.   HERNANDEZ BANDERAS was purportedly provided insulin.

34.   Another record from December 24 documented that HERNANDEZ BANDERAS's blood sugar level was 195 mg/dl, an extremely high and abnormal level, at 10:23 p.m.  Insulin was ordered again.

35.   On December 25, HERNANDEZ BANDERAS's "fasting" blood sugar level was checked again at 7:06 a.m., registering 192 mg/dl, an extremely high and abnormal reading.   HERNANDEZ BANDERAS was purportedly provided insulin.

36.   Another December 25 note documented that the skin on his leg was red and increasing in size, tight and glossy, and painful despite pain medication.

37.   On December 26, HERNANDEZ BANDERAS was unable to walk and came to the medical center in a wheelchair.  His pain was uncontrolled by pain medication, at a reported level of 8/10.

38.   HUI examined HERNANDEZ BANDERAS on December 26, two weeks after his diabetes diagnosis and debridement of dead tissue.  HUI documented that the dead skin tissue had extended from a 1 cm. area on the ankle to "mid shin" and was swollen.  HUI treated HERNANDEZ BANDERAS's condition by debriding more dead tissue.  She noted that he had an open bloody wound with some layers of soft dead tissue. Another record from December 26 documented that HERNANDEZ BANDERAS's blood sugar level was 303 mg/dl, an extremely high and abnormal level. Insulin was ordered again.

39.   Despite the fact that HUI had actual knowledge that HERNANDEZ BANDERAS was a newly diagnosed diabetic, his blood sugar levels were abnormally

1  high and uncontrolled by insulin, he could no longer walk and was confined to a

2  wheelchair, and his leg was deteriorating and dying, HUI failed to refer HERNANDEZ

3  BANDERAS to a diabetic wound specialist to treat his obviously serious condition.

4       40.     On December 28, HERNANDEZ BANDERAS's "fasting" blood sugar level

5  was 276 mg/dl, an extremely high and abnormal reading.   HERNANDEZ BANDERAS

6

7  was purportedly provided insulin.  HERNANDEZ BANDERAS continued to complain of

8  pain.  HUI surgically removed more dead tissue from HERNANDEZ BANDERAS's leg.

9  She noted that he had an open bloody wound with some layers of soft dead tissue.

10       41.     On December 28, HERNANDEZ BANDERAS's "fasting" blood sugar level

11  was 272 mg/dl, an extremely high and abnormal reading.   HERNANDEZ BANDERAS

12

13  was purportedly provided insulin.

14       42.     On December 31, HERNANDEZ BANDERAS's blood sugar level was 247

15  mg/dl, he complained of leg pain, and requested a wheelchair with a footrest.  He was

16  told that no other wheelchair was available and that he should resume walking soon.

17       43.     On January 1, 2007, HERNANDEZ BANDERAS's blood sugar level was

18

19  290 mg/dl, an extremely high and abnormal reading.   HERNANDEZ BANDERAS was

20  purportedly provided insulin.

21       44.     On January 2, HERNANDEZ BANDERAS continued to complain of leg

22  pain and more dead tissue was removed from his leg.

23

24       45.     On January 3, HERNANDEZ BANDERAS continued to complain of leg

25  pain, his blood sugar level was 262 mg/dl, and HUI removed more dead tissue from his

26  leg.  She noted that he had an open bloody wound with some layers of soft dead tissue.

27       46.     On January 4, HERNANDEZ BANDERAS's "fasting" blood sugar level

28

was 241 mg/dl in the morning, an extremely high and abnormal reading.   HERNANDEZ BANDERAS was purportedly provided insulin, but later in the day, his blood sugar was 265 mg/dl.  HUI again removed more dead tissue from HERNANDEZ BANDERAS's leg. She noted that he had an open bloody wound with some layers of soft dead tissue.

47.   On January 5, HUI again removed more dead tissue from HERNANDEZ BANDERAS's leg. She noted that he had an open bloody wound with some layers of soft dead tissue.  HERNANDEZ BANDERAS's blood sugar level was still abnormally high and uncontrolled by insulin.

48.   On January 6, HERNANDEZ BANDERAS's records document that his leg began to exude a horrible smell and his blood sugar was still abnormally high and uncontrolled by insulin.

49.   On January 7, HERNANDEZ BANDERAS's leg continued to exude a horrible smell and his blood sugar was still abnormally high and uncontrolled by insulin.

50.   On January 8, HERNANDEZ BANDERAS continued to complain to DIHS medical providers about the horrible smell exuding from his leg.  HERNANDEZ BANDERAS's blood sugar level was still abnormally high and uncontrolled by insulin.

51.   On January 9, HUI documented that HERNANDEZ BANDERAS had an open bloody wound that smelled, but merely changed his dressings and still did not refer him to a diabetic wound specialist.  HERNANDEZ BANDERAS's blood sugar level was still abnormally high and uncontrolled by insulin.

52.   On January 10, HUI documented that HERNANDEZ BANDERAS had an open bloody wound that smelled "very strong today", but merely changed his dressings and still did not refer him to a diabetic wound specialist.  HERNANDEZ BANDERAS's

1   blood sugar level was still abnormally high and uncontrolled by insulin.

2         53.    On January 11, records document that HERNANDEZ BANDERAS's pain

3   was increasing and was described as a "burning" pain.  HERNANDEZ BANDERAS's

4   blood sugar level was still abnormally high and uncontrolled by insulin.

5         54.    On January 16, HERNANDEZ BANDERAS was examined by HUI, who

6   documented that HERNANDEZ BANDERAS had started to bleed more the day before.

7   HUI also documented that his wound had grown to 10 cm. by 5 cm., but documented,

8   "no evidence of cellulitus."  HUI purposefully, knowingly, and intentionally

9   misrepresented the seriousness of HERNANDEZ BANDERAS's medical condition

10  throughout the medical records.  She purposefully downplayed the seriousness of

11  HERNANDEZ BANDERAS's condition in an effort to protect herself from liability and

12  create an inaccurate and fraudulent record of the course of HERNANDEZ

13  BANDERAS's medical condition.  Nevertheless, HUI requested a Treatment

14  Authorization Request ("TAR") for a referral to a specialist for surgery on the same day

15  that she documented in the medical chart that there was "no evidence of cellulitis."  The

16  TAR documented that HERNANDEZ BANDERAS had "right foot cellulitis with deep

17  ulceration."  It also documented that the tissue around his ankle was non-viable and

18  most likely necrotic and that there was a malodorous smell.

19        55.    On January 17, HERNANDEZ BANDERAS was transported to an off-site

20  facility (Paradise Valley Hospital) for wound management due to extensive necrotic

21  tissue, foul smell, and an inability for DIHS to properly care for his wound.

22        56.    Upon admission, a Paradise Valley physician (Jose Otero, M.D.) noted the

23  following: "The right leg has a large, deep, gangrenous ulceration measuring about 15 x

8 cm. on the ankle and on the foot on the medial aspect. The deeper structures are exposed and he may have necrotic joint capsules on the ankle joint and on the foot joints with the possibility of underlying septic arthritis of the foot joints. I cannot feel pulses on his foot but he has pulses on the left foot.

Dr. Otero's IMPRESSION: Gangrenous ulceration on a diabetic with peripheral vascular disease. He has pulses on his left foot but vascular investigation shows distal occlusion apparently distal to the area of gangrene. COMMENTS: This is a very severe situation that might end in amputation of the ankle and foot as the joints may be infected and he may have underlying osteomyelitis."

57.    On January 18, another Paradise Valley clinician documented the following: "The patient is a 40-year-old male who was recently diagnosed with diabetes mellitus in the beginning of 12/2006. He had a small wound on his right great toe at the beginning of December which apparently developed into an abscess that was drained, according to the patient's description. He states in mid-December he developed a wound over his right medial malleolus after accidentally striking it in the shower. He states that various debridements have been performed while at his correctional facility. He was on a course of clindamycin and Ancef for 2 weeks and states that during this time multiple blisters developed which subsequently ruptured, draining first "dark fluid" and then "orange fluid". He states subsequent to that the wound turned brown and black and developing [sic] a foul odor. He states the wound has been getting progressively larger. He has pain and is unable to walk secondary to the pain in his right ankle. He was referred to our clinic for further evaluation and treatment but the authorization was not processed and so he was seen in the emergency department instead on the same

date, from where he was admitted with gangrene and cellulitis of the right ankle. He was

started on broad spectrum antibiotics with Zosyn and an infectious disease consultation

was requested. A wound culture was obtained. X-rays have been obtained which

demonstrate irregularity of the right medial malleolus, suggestive of osteomyelitis."

58.     On January 18, another surgeon made the following diagnosis:

"IMPRESSIONS: Wagner grade 4 diabetic right ankle ulcer with underlying

osteomyelitis; Wagner grade 4 diabetic right great toe ulcer; This places the patient at

high risk for sepsis, need for amputation and even death; The patient's wound healing

will be impaired by anemia, depleted protein stores and severe infection with underlying

osteomyelitis; Necrotic tissue requires debridement to allow for further drainage of the

wound; Patient requires further vascular evaluation given absent distal pulses and the

presence of gangrene."

59.     HERNANDEZ BANDERAS continued to be hospitalized as an in-patient at

Paradise Valley Hospital until on or about February 22, 2007, when he was released

from ICE custody, so that the federal government would no longer have to pay for his

medical care that was necessitated by the defendants' failure to appropriately manage

his diabetic foot wound in early December 2006.  In fact, HERNANDEZ BANDERAS

was told by an ICE official that he was being released so that the UNITED STATES

would no longer have to pay for his care.

60.     The UNITED STATES and its agents/employees provided care based on

a DIHS Detainee Covered Services Package providing, in pertinent part: "The DIHS

Medical Dental Detainee Covered Services Package primarily provides health care

services for emergency care.  Emergency care is defined as 'a condition that is

threatening to life, limb, hearing, or sight.' Accidental or traumatic injuries incurred while in the custody of ICE or BP and acute illnesses will be reviewed for appropriate care. Other medical conditions which the physician believes, if left untreated during the period of ICE/BP custody, would cause deterioration of the detainee's health or uncontrolled suffering *affecting his/her deportation status* will be assessed and evaluated for care. All health care services for which a claim for payment is submitted to DIHS require authorization. Elective, non-emergent care requires prior authorization. DIHS must be notified of emergency care services within 24 business hours of occurrence. Requests for pre-existing, non-life threatening conditions, will be reviewed on a case by case basis. All medical service requests should have correlating clinical signs and symptoms."

61.     The DIHS policy differs from the medical policies that govern convicted criminals in the custody of the United States Department of Justice, Federal Bureau of Prisons. Convicted criminals are not faced with the presumption that their "pre-existing" or "non-emergent" medical needs will not be treated. They are also treated irrespective of their "deportation status." Unlike immigration detainees, they are not automatically denied care without approval for conditions that are not considered an "emergency." Unlike immigration detainees, they do not need to obtain prior approval to obtain medical treatment for "urgent conditions."

62.     The DIHS policy was promulgated by high-ranking DIHS officials, including, but not limited to, MIGLIACCIO and SHACK, who were aware or should have been aware that the policy violated the United States Constitution when it was created.

63.     HUI was never provided any written guidelines, rules, instruction, or

advice on how to interpret the policy regarding treatment based on deportation status.

64.     HUI did not have sufficient training and/or experience as a physician to manage the medical care required for a 1,000-bed facility like SDCF and was the only physician providing medical care there after May or June 2006, during the time relevant to this suit.

65.     According to HUI, DIHS's medical definition of "elective" is: "any procedure that we have time to submit a TAR and allow for approval...in the sense that it is not an emergency that they will die now."   In other words, any medical condition where death is not immediately imminent is elective.   This view of "elective" does not mean that the procedure is not medically necessary.

66.     The UNITED STATES had an inadequate and deficient process for hiring/retaining, training, and supervising medical care providers such that at SDCF, physician assistants ("PA") made the medical decisions that a licensed medical doctor should make, including diagnosing conditions and creating a treatment plan.

67.     There were no DIHS policies, guidelines, or procedures to determine when patients should be seen by a PA, rather than a physician, based on the severity of a patient's medical condition.

68.     SDCF did not employ any tickler or alert system at DIHS that would notify physicians about particular patients with serious medical conditions that needed monitoring.

69.     At SDCF, there was no policy, procedure, or arrangement with outside providers to make sure that detainees received timely specialist care when needed.   In fact, the UNITED STATES failed to make payments to outside providers for services

rendered such that providers would no longer agree to treat ICE detainees

70.     The specific failures of the individually named federal Defendants and the UNITED STATES were committed in the context of a broader custom, policy, or practice established by the UNITED STATES to provide constitutionally inadequate medical care to detainees.  The examples set forth below establish that the Defendants knew that they were providing inadequate care to detainees, but continued to do so, oftentimes trying to cover up their inadequate practices by destroying and/or altering official government records.

71.     For example, while the number of detainees in ICE custody has tripled since 2001, the DIHS budget has only increased by 65%, obviously providing inadequate resources to provide necessary medical care to detainees.

72.     It has been well documented by DIHS physicians that numerous preventable deaths and significant injuries have occurred on a regular basis due to incompetence and/or inadequate resources.  These concerns by DIHS physicians were communicated up the chain of command to the final policy makers for providing medical care to immigration detainees.

73.     Some 83 detainees have died in, or soon after, custody during the past five years. The deaths are the loudest alarms about a system teetering on collapse. Actions taken – or not taken – by medical staff members may have contributed to 30 of those deaths, according to confidential internal reviews and the opinions of medical experts who reviewed some death files for *The Washinton Post*.

74.     According to an analysis by *The Post*, most of the people who died were young.  Thirty-two of the detainees were younger than 40, and only six were 70 or older.

1   The deaths took place at dozens of sites across the country.

2          75.     Instead of recognizing that detainees were receiving inadequate medical

3   care and seeking to improve it, the UNITED STATES had a custom, policy, or practice

4   of covering up inadequate care and ratifying constitutionally inadequate care by high-

5   ranking government officials.

6

7          76.     For example, In July 2006, David Lusche ("LUSCHE"), a PA at SDCF,

8   where HERNANDEZ BANDERAS was being held, realized that a grievance filed by

9   another detainee, Francisco Castaneda, was still pending and that an audit of the

10  compound's medical files was approaching.  At 2:26 a.m. on July 28, he e-mailed a

11  colleague, asking him to retrieve a handwritten grievance from Castaneda that LUSCHE

12
13  had left in a drawer in an examining room.

14         77.     "We need to write something different, or make some amendment, on the

15  Grievance for Francisco Castaneda," LUSCHE wrote. ". . . Your response starts,

16  'Grievance not resolved.' Those words are going to attract all kinds of attention during

17
18  an ICE Jail Standards audit. . . . Could you somehow 'patch up' that Grievance with an

19  amendment then put it in my box. I just want to avoid problems when the Auditors show

20  up."

21         78.     WALKER, a PA at SDCF, responded the next morning at 10:10 a.m.: "But

22  it is true, unfortunately, this is a case where his grievance is correct and I don't blame

23
24  the detainee."

25         79.     SHACK, the DIHS Medical Director, ratified the Defendants conduct in the

26  Castaneda case by stating: "I looked over about 200 pages of medical records for this

27  case.  In my opinion, the care provided to this detainee was, and is, timely and

28

appropriate." He also described the care Castaneda received as "good care." By contrast, the UNITED STATES has now admitted in litigation that its negligence caused Castaneda's penis amputation and death. At the time SHACK made public comments praising the care received by Castaneda, he had authored an internal memo opining that the care received by Castaneda was beneath the standard of care.

80.     Similarly, SHACK has also publicly praised the care received by HERNANDEZ BANDERAS, even though an internal memo evaluating the case concluded that DIHS failed to meet the standard of care in treating HERNANDEZ BANDERAS. (See internal memo attached as Exhibit 1 to Complaint.)

81.     Immigration officials told congressional staffers in October 2007 that the San Pedro Processing Center, another detention facility in California, was closed to renovate the fire-suppression system and replace the hot-water boiler. But internal documents and interviews reveal unsafe conditions that forced the agency to relocate all 404 detainees that month. An audit found 53 incidents of medication errors.

82.     Internal ICE and DIHS documents show that high-ranking final policy makers know that the system for providing medical care is inadequate and that piecemeal fixes are not enough.

83.     As reported in *The Post*: "The onus is on us if it hits the fan," one official complained during a high-level headquarters meeting about staff shortages late last summer, according to records of the conversation. "We're going to be responsible if something happens, because it's well documented that we know there's a problem, that the problem is severe."

84.     As reported in *The Post*: "We are putting ourselves and our patients at

1   risk," another official said.

2       85.     Doctors express concerns about violating medical ethics and fear lawsuits.

3   In July, HUI sent a memo to DIHS medical director SHACK, saying her colleagues were

4   worried that they might be sued because of the substandard care they were giving

5   detainees.  The agency's mission of "keeping the detainee medically ready for

6   deportation" often conflicts with the standards of care in the wider medical community,

7   Hui wrote. "I know in my gut that I am exposing myself to the US legal standard of care

8   argument.... Do we need to get personal liability insurance?"

9

10      86.     Nurses who work on the front lines see the problems up close. "Dogs get

11  better care in the dog pound," said Catherine Rouse, a contract nurse at an Arizona

12  detention center who quit after two months last year because she saw what she

13  regarded as "scary medicine" in the prison:  patients taken off medications they needed

14  and nurses doing tasks they were not qualified to do. "You don't treat people like that.

15  There has to be some kind of moral fiber," Rouse said.

16

17      87.     Neil Sampson, who ran DIHS as interim director most of last year, left that

18  job with serious questions about the government's commitment. Sampson said in an

19  interview with a *Washington Post* reporter that ICE treated detainee health care "as an

20  afterthought," reflecting what he called a failure of leadership and management at the

21  Homeland Security Department.  "They do not have a clear idea or philosophy of their

22  approach to health care [for detainees]," he said.  "It's a system failure, not a failure of

23  individuals."

24

25

26      88.     A new director for health services arrived six months ago, following a

27  stretch when the agency was run first by Sampson and then by a second interim

28

director.  The new boss is LaMont W. Flanagan, who brought with him the credential of

having been fired in 2003 by the state of Maryland for bad management and spending

practices supervising detention and pretrial services.  An audit found that Flanagan had

signed off on payments of $145,000 for employee entertainment and other ill-advised

expenditures.  His reputation was such that the District of Columbia would not hire him

for a juvenile-justice position.

89.     A shortage of doctors and nurses is commonplace at detention centers

across the country.  Records from February show that about 30 percent of all DIHS

positions in the field were unfilled.  Concern about the vacancies is voiced repeatedly at

clinical directors' meetings.  "How do we state our concerns so that we can be heard?

. . . this is a CRITICAL condition. . . . We have bitten off more than we can chew," a

physician wrote in the minutes of one meeting last summer.

90.     In some prisons, the staffing shortages are acute.  The Willacy County

detention center in South Texas – the largest compound, with 2,018 detainees – has no

clinical director, no pharmacist and only a part-time psychiatrist.  Nearly 50 percent of

the nursing positions were unfilled at the 1,500-detainee Eloy, Ariz., prison in February.

At the newly opened 744-bed Jena, La., compound, nurses run the place.  It has no

clinical director, no staff physician, no psychiatrist and no professional dental staff.

91.     In August 2007, Sampson, who was then DIHS interim director, warned

his superiors at ICE that critical personnel shortages were making it impossible to staff

the Jena facility adequately.  In an e-mail to Gary Mead, the ICE deputy director in

charge of detention centers, he wrote: "With the Jena request we have been re-

examining our capabilities to meet health care needs at a new site when we are facing

critical staffing shortages at most every other DIHS site.  While we developed, executed and achieved major successes in our recruitment efforts we have been unable to meet the demand."

92.     The slow ICE security-clearance process forced many job applicants to go elsewhere, Sampson wrote.  Of the 312 people who applied for new positions over the past year, 200 withdrew, he wrote, because they found other jobs during the 250 days it took ICE, on average, to conduct the required background investigations.  More recently, ICE officials said the average wait had decreased recently to 37 days.

93.     These shortages have burdened the remaining staff.  In July 2007, a year after an inmate's death at SDCF, HUI strongly complained to headquarters about workload stress. "The level of burnout . . . is high and rising," she wrote in an e-mail.  "I know that I have been averaging approximately 2-6 hrs of overtime daily for the past 2 months.  I will no longer be able to sustain this pace and will be decreasing the number of hours that I work overtime.  This being said, more will be left undone because we simply do NOT have the staff."

94.     In one 2007 death, memos and confidential notes show how medical staff missed an infectious disease, meningitis, in their midst.  Victor Alfonso Arellano, 23, a transgender Mexican detainee with AIDS, died in custody at the San Pedro Processing Center.  The first three pages of an internal review of the death leave the impression that Arellano's care was proper.  But the last page, under the heading "Off the record observations and recommendations," takes a decidedly critical tone: "The clinical staff at all levels fails to recognize early signs and symptoms of meningitis. . . . Pt was evaluated multiple times and an effort to rule out those infections was not even

mentioned."

95.     Delays persist throughout the system. In January 2008, the detention center in Pearsall, Tex., an hour from San Antonio, had a backlog of 2,097 appointments.

96.     Luis Dubegel-Paez, a 60-year-old Cuban, had filled out many sick call requests before he died on March 14, 2008.  Detained at the Rolling Plains Detention Facility in the West Texas town of Haskell, he wrote on New Year's Day:  "need to see doctor for Heart medication; and having chest pains for the past three days.  Can't stand pain."

97.     Ten days later he went to the clinic and became upset when he wasn't seen.  He slugged the window, yelled, and pointed at his wristwatch.  He was escorted back to his cell.

98.     Another of his sick call requests said:  "Need to see a doctor. I have a lot of symptoms of sickness ... as soon as possible!" The next was more urgent: "I have a emergency to see the doctor about my heart problems ... for the last couple days and I been getting dizzy a lot."

99.     The next day, Dubegel-Paez collapsed and died.  His medical records do not show that he ever saw a doctor for his chest pains.

100.    Hanna Boutros, 52, who came to the United States 30 years ago, waited seven months for surgery after receiving a diagnosis of "high-grade" prostate cancer, which his urologist urged be treated immediately. ICE officials sent him to Krome Service Processing Center in Miami because, they said, it could best deal with his condition.

101.   But he was seen by nurses, not a doctor, until he found an outside lawyer to threaten a suit.  Boutros finally got surgery just before Christmas, before he was deported to Lebanon, leaving two children and a wife in the United States.  "I was miserable. I was very, very scared. It was always burning," he said.

102.   DIHS operates with a top priority of limiting care and saving money. Its medical mission is only to keep people healthy enough to be deported.

103.   One DIHS chart, covering October 2005 to September 2006, is labeled "TAR Cost Savings Based on Denials."  The agency, the chart shows, saved $129,713 by denying 17 medical requests for people with HIV, $36,216 by denying seven requests for people with various forms of psychosis, $91,926 by denying 27 requests for people with chest pain and $9,545 by denying treatment for a case of blood in stool.

104.   Managed Care technicians routinely withhold treatment for many types of care, in an attempt to save money.  For mental health services, four denials for treatment of manic-depressive psychosis saved DIHS $18,145.36, according to an itemized record of the savings over a one-year period ending in August 2006.  Two denials for care of "unspecified psychosis" saved an estimated $11,668.60. Nine denials for treatment of "depressive disorder not elsewhere classified" saved $43,158.57.

105.   The supervisor of the managed-care nurses who rules on treatment requests sent a note once to a senior official about a 33-year-old detainee seen at a Nashville hospital for a recurrence of sarcoma.  "The process of re-diagnosis and treatment will be extensive and costly," that nurse wrote.  She said she seconded the idea of releasing the detainee so the government would not have to pay for his care.

106.   These sorts of machinations prompted the deputy warden at York County

Prison in Pennsylvania, which houses many immigrant detainees, to write a letter about the health services division.  "[I]n my opinion, they have set up an elaborate system that is primarily interested in delaying and/or denying medical care to detainees," the warden, Roger Thomas, wrote in late 2005.  "There is nothing easy about working with DIHS. If something can be delayed, it is delayed. If it can be denied, it is denied. If it can be difficult, it is made difficult. Most importantly, if there is some bureaucratic procedure that will delay/deny treatment to a detainee . . . you can be assured that DIHS will do it."

107.     An Officer-In-Charge at an ICE facility e-mailed up the chain of command. "I believe this case illustrates that we need something more efficient," he wrote.  ". . . If we need more medical staff, then they need to be deployed, but regardless of what the solution is, it needs to occur rather quickly, as access to adequate medical care for our detainees is a rather critical issue."

108.     WALKER, a PA who treated both Castaneda and HERNANDEZ BANDERAS at SDCF, has testified under oath that the "worst criminals in the world," detained in the Federal Bureau of Prisons receive better medical care than immigration detainees under the DIHS system.

109.     In his deposition in *Castaneda v. United States*, 538 F. Supp .2d 1279 (C.D. Cal 2008), WALKER provided the following testimony about the working conditions at SDCF: "I just didn't feel that we had good supervision.  There was a lot of micro managing.  There was no communication.  You know, it was a lot of bickering, a lot of, you know, 'This is my square.' 'No.  This is my square.'  There was just no cohesion.  Morale was low and I just never worked in an environment like that, you know.  So that was something new.  I've never worked in it.  Even when I was in war –

1  and I've told people this before – even when I was in war sitting in a foxhole, it was
2  never that bad like it was at San Diego."

3      110.    WALKER described how other medical providers at SDCF felt about
4  working under HUI: "Just her – she can be a little forceful.  They felt she was
5  disrespectful, that she would belittle people and their license and their professionalism,
6  that others had felt that she always worked towards the minimum.  And so – it just was
7  not a good place to work, and it flowed into my home, you know, and so my wife and I
8  talked about it and said 'We can't do this.  I got to go.'"

9      111.    When asked what he meant by HUI "working towards the minimum,"
10  WALKER testified: "I think just managing the patients as – if they have high blood
11  pressure, you measure high blood pressure.  You put them on the right meds and that's
12  kind of it.  We hardly ever sent anybody out to a cardiologist.  We didn't send people
13  who had other wounds that needed probably wound care specialist, wouldn't send them
14  out.  Diabetics wouldn't go to a diabetic specialist."

### FIRST CAUSE OF ACTION
### Federal Tort Claims Act Claim against THE UNITED STATES OF AMERICA for
### Medical Negligence (Non-Jury Claim)

      112.    Plaintiff incorporates by reference all allegations contained in the
preceding paragraphs of this Complaint, as if fully set forth here.

      113.    Defendant UNITED STATES' treatment of HERNANDEZ BANDERAS
while he was detained at SDCF violated the Federal Tort Claims Act ("FTCA"), 28
U.S.C. §§ 1346 and 2672.  All conditions precedent to this lawsuit have been performed
or have occurred, including providing pre-suit notice to the UNITED STATES pursuant
to the FTCA.  Six months have elapsed from the date a pre-suit claim was filed.

Therefore, all administrative exhaustion requirements have been met and this claim is ripe.

114.     At all material times, the UNITED STATES carelessly and negligently cared for and treated Plaintiff while he was detained at SDCF, and provided medical care in a careless and negligent manner and also acted with deliberate indifference to Plaintiff's known serious medical condition.  The UNITED STATES carelessly and negligently treated, managed, monitored and supervised Plaintiff's condition during his detention.  The UNITED STATES' negligent care and negligent failure to administer appropriate care directly and proximately resulted in certain injury and disability to Plaintiff, all to his general damage.

115.     As a direct and proximate result of the UNITED STATES' negligence, Plaintiff suffered certain injuries, including a recommendation to amputate his leg; great physical, mental, and emotional pain; disfigurement; and disability.

116.     As a further direct and proximate result of the negligent, acts, omissions and conduct of the UNITED STATES and its agents, and the injuries caused to Plaintiff, Plaintiff was required to and did incur expenses for services of hospitals, doctors, and other medical care and treatment in an amount not now known to him.

**SECOND CAUSE OF ACTION**
**FTCA Claim against UNITED STATES for Negligent Establishment of**
**Unconstitutional Policy for Providing Medical Care to Immigration Detainees**
**(Non-Jury Claim)**

117.     Plaintiff incorporates by reference all allegations contained in the preceding paragraphs of this Complaint, as if fully set forth here.

118.     Defendant UNITED STATES' treatment of HERNANDEZ BANDERAS while he was detained at SDCF violated the FTCA, 28 U.S.C. §§ 1346 and 2672.  All

conditions precedent to this lawsuit have been performed or have occurred, including

providing pre-suit notice to the UNITED STATES pursuant to the FTCA.  Six months

have elapsed from the date a pre-suit claim was filed.  Therefore, all administrative

exhaustion requirements have been met and this claim is ripe.

119.    At all material times, the UNITED STATES failed to use reasonable care

in establishing policies and directives for providing medical care to immigration

detainees.  The policies are embodied, in part, in a Managed Care plan for immigration

detainees that is referred to as the Immigration Detainee Covered Services Package

("Benefits Package").  The policies and directives for providing medical care were

unreasonable and inadequate, in part because these policies violated clearly

established constitutional law.

120.    As a direct and proximate result of the UNITED STATES' negligence in

creating and establishing these inadequate policies and directives, Plaintiff suffered

certain injuries, including a recommendation to amputate his leg; great physical, mental,

and emotional pain; disfigurement; and disability.

121.    As a further direct and proximate result of the negligent, acts, omissions

and conduct of the UNITED STATES and its agents, and the injuries caused to Plaintiff,

Plaintiff was required to and did incur expenses for services of hospitals, doctors, and

other medical care and treatment in an amount not now known to him.

### THIRD CAUSE OF ACTION
**FTCA Claim against UNITED STATES for Negligent Application of Policy for
Providing Medical Care to Immigration Detainees
(Non-Jury Claim)**

122.    Plaintiff incorporates by reference all allegations contained in the

preceding paragraphs of this Complaint, as if fully set forth here.

123.    Defendant UNITED STATES' treatment of HERNANDEZ BANDERAS while he was detained at SDCF violated the FTCA, 28 U.S.C. §§ 1346 and 2672.  All conditions precedent to this lawsuit have been performed or have occurred, including providing pre-suit notice to the UNITED STATES pursuant to the FTCA.  Six months have elapsed from the date a pre-suit claim was filed.  Therefore, all administrative exhaustion requirements have been met and this claim is ripe.

124.    At all material times, the UNITED STATES carelessly and negligently implemented and/or applied the ICE detainee medical care policy, including the Benefits Package, such that the Plaintiff's need for a specialist referral was not provided until it was too late to prevent severe and permanent damage to Plaintiff's right leg.  In addition to qualifying as negligence, the UNITED STATES' action violated the Plaintiff's constitutional right to adequate and reasonable medical care.

125.    As a direct and proximate result of the UNITED STATES' negligence, Plaintiff suffered certain injuries, including a recommendation to amputate his leg; great physical, mental, and emotional pain; disfigurement; and disability.

126.    As a further direct and proximate result of the negligent, acts, omissions and conduct of the UNITED STATES and its agents, and the injuries caused to Plaintiff, Plaintiff was required to and did incur expenses for services of hospitals, doctors, and other medical care and treatment in an amount not now known to him.

## FOURTH CAUSE OF ACTION
### FTCA Claim against UNITED STATES for Negligent Hiring/Retention
### (Non-Jury Claim)

127.    Plaintiff incorporates by reference all allegations contained in the preceding paragraphs of this Complaint, as if fully set forth here.

128.    Defendant UNITED STATES' treatment of HERNANDEZ BANDERAS while he was detained at SDCF violated the FTCA, 28 U.S.C. §§ 1346 and 2672. All conditions precedent to this lawsuit have been performed or have occurred, including providing pre-suit notice to the UNITED STATES pursuant to the FTCA. Six months have elapsed from the date a pre-suit claim was filed. Therefore, all administrative exhaustion requirements have been met and this claim is ripe.

129.    At all material times, the UNITED STATES carelessly and negligently hired and retained medical health care providers who did not have the experience and/or qualifications necessary to provide adequate medical care to immigration detainees, including HERNANDEZ BANDERAS. The UNITED STATES knew or should have known that the providers taking care of HERNANDEZ BANDERAS were not qualified to make the medical determinations necessary for his care.

130.    As a direct and proximate result of the UNITED STATES' negligence, Plaintiff suffered certain injuries, including a recommendation to amputate his leg; great physical, mental, and emotional pain; disfigurement; and disability.

131.    As a further direct and proximate result of the negligent, acts, omissions and conduct of the UNITED STATES and its agents, and the injuries caused to Plaintiff, Plaintiff was required to and did incur expenses for services of hospitals, doctors, and other medical care and treatment in an amount not now known to him.

## FIFTH CAUSE OF ACTION
### FTCA Claim against UNITED STATES for Negligent Supervision
### (Non-Jury Claim)

132.    Plaintiff incorporates by reference all allegations contained in the preceding paragraphs of this Complaint, as if fully set forth here.

133.    Defendant UNITED STATES' treatment of HERNANDEZ HERNANDEZ BANDERAS while he was detained at SDCF violated the FTCA, 28 U.S.C. §§ 1346 and 2672.  All conditions precedent to this lawsuit have been performed or have occurred, including providing pre-suit notice to the UNITED STATES pursuant to the FTCA.  Six months have elapsed from the date a pre-suit claim was filed.  Therefore, all administrative exhaustion requirements have been met and this claim is ripe.

134.    At all material times, the UNITED STATES carelessly and negligently supervised its medical health care providers, including physicians, mid-level providers, and nurses.   Physicians, including HUI, did not adequately supervise mid-level providers and nurses, and SHACK did not adequately supervise physicians, including HUI, who did not have the experience and/or qualifications necessary to provide adequate medical care to immigration detainees, including HERNANDEZ BANDERAS.

135.    As a direct and proximate result of the UNITED STATES' negligence, Plaintiff suffered certain injuries, including a recommendation to amputate his leg; great physical, mental, and emotional pain; disfigurement; and disability.

136.    As a further direct and proximate result of the negligent, acts, omissions and conduct of the UNITED STATES and its agents, and the injuries caused to Plaintiff, Plaintiff was required to and did incur expenses for services of hospitals, doctors, and other medical care and treatment in an amount not now known to him.

## SIXTH CAUSE OF ACTION
### FTCA Claim against UNITED STATES for Negligent Training
### (Non-Jury Claim)

137.    Plaintiff incorporates by reference all allegations contained in the preceding paragraphs of this Complaint, as if fully set forth here.

138.   Defendant UNITED STATES' treatment of HERNANDEZ BANDERAS while he was detained at SDCF violated the FTCA, 28 U.S.C. §§ 1346 and 2672.  All conditions precedent to this lawsuit have been performed or have occurred, including providing pre-suit notice to the UNITED STATES pursuant to the FTCA.  Six months have elapsed from the date a pre-suit claim was filed.  Therefore, all administrative exhaustion requirements have been met and this claim is ripe.

139.   At all material times, the UNITED STATES carelessly and negligently trained its medical health care providers, including physicians, mid-level providers, and nurses.   Physicians, including HUI, did not adequately train mid-level providers and nurses, and SHACK did not adequately train physicians, including HUI, who did not have the experience and/or qualifications necessary to provide adequate medical care to immigration detainees, including HERNANDEZ BANDERAS.

140.   As a direct and proximate result of the UNITED STATES' negligence, Plaintiff suffered certain injuries, including a recommendation to amputate his leg; great physical, mental, and emotional pain; disfigurement; and disability.

141.   As a further direct and proximate result of the negligent, acts, omissions and conduct of the UNITED STATES and its agents, and the injuries caused to Plaintiff, Plaintiff was required to and did incur expenses for services of hospitals, doctors, and other medical care and treatment in an amount not now known to him.

### SEVENTH CAUSE OF ACTION
**FTCA Claim against UNITED STATES for Intentional Infliction of Emotional Distress (Non-Jury Claim)**

142.   Plaintiff incorporates by reference all allegations contained in the preceding paragraphs of this Complaint, as if fully set forth here.

143.    Defendant UNITED STATES' treatment of HERNANDEZ BANDERAS while he was detained at SDCF violated the FTCA, 28 U.S.C. §§ 1346 and 2672.  All conditions precedent to this lawsuit have been performed or have occurred, including providing pre-suit notice to the UNITED STATES pursuant to the FTCA.  Six months have elapsed from the date a pre-suit claim was filed.  Therefore, all administrative exhaustion requirements have been met and this claim is ripe.

144.    At all material times, the UNITED STATES' treatment of HERNANDEZ BANDERAS during his detention, including but not limited to the failure to provide him reasonable and humane medical care, was conducted in an extreme and outrageous manner with the knowledge that Plaintiff was unable to care for himself during his incarceration.

145.    The UNITED STATES acted intentionally or with the reckless disregard of causing emotional distress.

146.    As a direct and proximate result of the unlawful conduct of the UNITED STATES and its agents, Plaintiff has suffered special damages, including but not limited to past and future loss of income, benefits, medical expenses, and other damages to be proven at the time of trial.

147.    As a direct and proximate result of the unlawful conduct of the UNITED STATES and its agents, Plaintiff has suffered general damages, including but not limited to shock, embarrassment, physical distress and injury, humiliation, severe emotional distress, stress and other damages to be proven at the time of trial.

148.    Plaintiff is informed and believes, and thereon alleges, that the UNITED STATES and its agents committed the acts herein alleged maliciously, fraudulently and

oppressively in conscious disregard for Plaintiff's rights and that the conduct of UNITED STATES and its agents was a substantial factor in causing Plaintiff's emotional distress.

## EIGHTH CAUSE OF ACTION
### *Bivens* Claim for Inadequate Medical Care against all INDIVIDUAL DEFENDANTS and DOES 1-10

149.    Plaintiff incorporates by reference all allegations contained in the preceding paragraphs of this Complaint, as if fully set forth here.

150.    This is a claim against all Defendants who were agents of the UNITED STATES and named in their individual capacity ("INDIVIDUAL DEFENDANTS"), as well as DOES 1-10.

151.    The INDIVIDUAL DEFENDANTS and DOES 1-10 violated Plaintiff's right to adequate medical care under the Fifth, Eighth and Fourteenth Amendments of the United States Constitution by failing to treat Plaintiff's known serious medical condition.

152.    At all material times, the INDIVIDUAL DEFENDANTS and DOES 1-10 were aware that HERNANDEZ BANDERAS had a serious and deteriorating diabetic foot wound that required an urgent, if not emergent, referral to a diabetic wound specialist and/or other specialists to treat his serious life- and limb-threatening condition.

153.    The INDIVIDUAL DEFENDANTS and DOES 1-10 purposefully denied HERNANDEZ BANDERAS essential medical care for a known serious medical condition, despite knowledge that HERNANDEZ BANDERAS's right leg was dying and required urgent care.

154.    The actions of the INDIVIDUAL DEFENDANTS and DOES 1-10 were so substandard and egregious that they were outside the course and scope of their employment.  Their actions and judgments in ostensibly rendering "medical care" to

HERNANDEZ BANDERAS were so far below the acceptable standard that the INDIVIDUAL DEFENDANTS and DOES 1-10 could not have been making a "medical" judgment in their decision to deny HERNANDEZ BANDERAS an essential medical referral.

155.    The actions of the INDIVIDUAL DEFENDANTS and DOES 1-10 were outside of the scope of "medical or related functions" as defined in 42 U.S.C. § 233(a) because their decision to deny HERNANDEZ BANDERAS medical care was not based on a medical reason, but rather economic and/or other constitutionally impermissible reasons unrelated to providing medical services.

156.    Each of the INDIVIDUAL DEFENDANTS and DOES 1-10 were acting under color of law by exercising power made possible because the Defendants were clothed with the authority of federal law.

157.    The INDIVIDUAL DEFENDANTS and DOES 1-10 acted with deliberate indifference to the serious health needs protected by the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, subjected Plaintiff to dangerous and debasing conditions of confinement, and violated basic fundamental rights to safe and humane confinement.  The inhumane conditions of confinement caused Plaintiff medical injuries as alleged in this Complaint. The conduct constituted cruel and unusual punishment and a violation of due process.

158.    The INDIVIDUAL DEFENDANTS and DOES 1-10 are liable for creating an unconstitutional policy and/or custom for providing medical care to detainees.

159.    The INDIVIDUAL DEFENDANTS and DOES 1-10 acted with deliberate indifference toward hiring/retaining, training, and supervising U.S. employees such that

1    they violated Plaintiff's constitutional rights.

2        160.    The INDIVIDUAL DEFENDANTS and DOES 1-10 violated clearly

3    established law by failing to adequately treat and/or diagnose a known serious medical

4    condition.

5        161.    As a result of the Defendants' constitutional violations of Plaintiff's rights,

6    Plaintiff sustained injuries and damages as follows:

7

8            a.  Non-economic damages consisting of past and future physical and mental

9                pain and suffering, mental anguish, emotional stress, and the loss of the

10               enjoyment of a full and complete life;

11

12           b.  Physical impairment and disfigurement; and

13           c.  Economic losses consisting of past medical and health care expenses and

14               loss of future earning capacity and ability to earn money in the future.

15       162.    The conduct of each of the INDIVIDUAL DEFENDANTS and DOES 1-10

16   constitutes a reckless or callous disregard of Plaintiff's constitutional right to adequate

17
     medical care, entitling Plaintiff to punitive damages.
18

19                            **NINTH CAUSE OF ACTION**
                *Bivens* **Claim for Equal Protection Violations against all INDIVIDUAL**
20                         **DEFENDANTS and DOES 1-10**

21       163.    Plaintiff incorporates by reference all allegations contained in the

22   preceding paragraphs of this Complaint, as if fully set forth here.
23

24       164.    This is a claim against the INDIVIDUAL DEFENDANTS and DOES 1-10.

25       165.    The INDIVIDUAL DEFENDANTS and DOES 1-10 violated Plaintiff's right

26   to equal protection under the Fifth and Fourteenth Amendments of the United States'

27
     Constitution by failing to treat Plaintiff's known serious medical condition due to his
28

immigration status, without a rational basis to do so.

166.    At all material times, the INDIVIDUAL DEFENDANTS and DOES 1-10 were aware that HERNANDEZ BANDERAS had a serious and deteriorating diabetic foot wound that required an urgent, if not emergent, referral to a diabetic wound specialist and/or other specialists to treat his serious life- and limb-threatening condition.

167.    The INDIVIDUAL DEFENDANTS and DOES 1-10 purposefully denied HERNANDEZ BANDERAS essential medical care for a known serious medical condition, despite knowledge that HERNANDEZ BANDERAS's right leg was dying and required urgent care.

168.    The actions of the INDIVIDUAL DEFENDANTS and DOES 1-10 were so substandard and egregious that they were outside the course and scope of their employment.  Their actions and judgments in ostensibly rendering "medical care" to HERNANDEZ BANDERAS were so far below the acceptable standard that the INDIVIDUAL DEFENDANTS and DOES 1-10 could not have been making a "medical" judgment in their decision to deny HERNANDEZ BANDERAS an essential medical referral.

169.    The actions of the INDIVIDUAL DEFENDANTS and DOES 1-10 were outside of the scope of "medical or related functions" as defined in 42 U.S.C. § 233(a) because their decision to deny HERNANDEZ BANDERAS medical care was not based on a medical reason, but rather economic and/or other constitutionally impermissible reasons unrelated to providing medical services.

170.    Each of the INDIVIDUAL DEFENDANTS and DOES 1-10 were acting under color of law by exercising power made possible because the Defendants were

clothed with the authority of federal law.

171.    The INDIVIDUAL DEFENDANTS and DOES 1-10 acted in violation of the equal protection component of the Due Process Clause of the Fifth Amendment of the United States Constitution by discriminating against HERNANDEZ BANDERAS based on his immigration status with no rational basis to do so.  In that regard, the INDIVIDUAL DEFENDANTS and DOES 1-10 failed to refer HERNANDEZ BANDERAS to a diabetic wound specialist in a timely manner because he was an immigration detainee, despite having a policy to provide this type of care to other federal prisoners who were not in the same class as HERNANDEZ BANDERAS.

172.    The INDIVIDUAL DEFENDANTS and DOES 1-10 are liable for creating an unconstitutional policy and/or custom for providing medical care to detainees.

173.    The INDIVIDUAL DEFENDANTS and DOES 1-10 acted with deliberate indifference toward hiring/retaining, training, and supervising U.S. employees such that they violated Plaintiff's constitutional rights.

174.    The INDIVIDUAL DEFENDANTS and DOES 1-10 violated clearly established law by violating HERNANDEZ BANDERAS's constitutional right to equal protection under the laws.

175.    As a result of the Defendants' constitutional violations of Plaintiff's rights, Plaintiff sustained injuries and damages as follows:

  a.  Non-economic damages consisting of past and future physical and mental pain and suffering, mental anguish, emotional stress, and the loss of the enjoyment of a full and complete life;

  b.  Physical impairment and disfigurement; and

c.  Economic losses consisting of past medical and health care expenses and

loss of future earning capacity and ability to earn money in the future.

176.    The conduct of each of the INDIVIDUAL DEFENDANTS and DOES 1-10

constitutes a reckless or callous disregard of Plaintiff's constitutional right to equal

protection under the laws, entitling Plaintiff to punitive damages.

### JURY TRIAL DEMAND

Plaintiff demands a jury trial to resolve all claims brought herein except for the

claims against the UNITED STATES OF AMERICA under the FTCA, which must be

adjudicated by the Court.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that, after due proceedings, judgment be entered

in favor of Plaintiff and against all Defendants, jointly and severally, and that this Court:

(a)  Award Plaintiff all compensatory damages reasonable under the

circumstances, including damages for physical pain and suffering,

mental anguish and emotional distress, disfigurement, medical

expenses, loss of enjoyment of life, and any other compensatory

damages, for each count alleged in the Complaint;

(b)  Award Plaintiff punitive damages against all Defendants sued in their

individual capacity (Plaintiff acknowledges that punitive damages are

not available against the UNITED STATES);

(e)  Award Plaintiff legal interest on all damages awarded from the date

of judicial demand until paid; and

(f)    Award Plaintiff such other and further relief as this Court deems just
and proper.

Dated this 7th day of October, 2008.

By: _____
CONAL DOYLE

**EXHIBIT 1**

**Medical Report**

**Administrative Tort Claim:** Martin Hernandez Banderas (07-0421)
SF-95 received by DHHS OGC on July 3, 2007

**Conclusion:**

**Was the duty owed the individual (i.e., standard of care) met and, if not, who (provider and/or institution) failed to meet the duty owed?**
The duty owed the individual was not met by the providers caring for the detainee. They failed to appreciate the severity and/or potential extent of the diabetic foot wounds that were not improving over an extended period of time in light of his peripheral neuropathy, poor circulation, and evidence of systemic involvement with the infection. Surgical consultation should have been sought earlier.

11

Banderas